WHITE RIVER DEVELOPMENT COM-
PANY, Plaintiff–Respondent,

v.

MECO SYSTEMS, INC., A
Missouri Corporation.

FIDELITY and DEPOSIT COMPANY
OF MARYLAND, Defendants and
Third Party Plaintiffs–Appellants,

v.

GREAT SOUTHERN SAVINGS AND
LOAN ASSOCIATION and Great
Southern Financial Corporation, Third
Party Defendants–Appellants.

No. 16835.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 28, 1991.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 22, 1991.

Application to Transfer Denied
May 3, 1991.

Emory Melton, Donald L. Cupps, Ellis, Ellis and Cupps, Cassville, for plaintiff-respondent.

John R. Lewis, Mary Lou Martin, Law Offices of John R. Lewis, P.C., Springfield, for defendants and third party plaintiffs-appellants.

M. Brent Hendrix, Springfield, for third party defendants-appellants.

PREWITT, Judge.

Plaintiff sought damages against defendant Meco Systems, Inc. (Meco) and defendant Fidelity and Deposit Company of Maryland (Fidelity). Plaintiff's claim was based on breach of a construction contract which it had with Meco to construct condominium residential buildings consisting of two four-plexes and two eight-plexes on the same tract. Fidelity was the surety on a performance bond and a "Labor and Material Payment Bond" provided by Meco on the project.

Meco filed a counterclaim, seeking additional sums which it claims were due it under the contract and change orders amending it, and sought to impose a mechanics lien on a portion of the tract. Meco brought in as parties Great Southern Savings and Loan Association and Great Southern Financial Corporation. Great Southern Financial Corporation was the trustee and Great Southern Savings and Loan Association the beneficiary of a deed of trust on the property. Great Southern Savings and Loan Association loaned plaintiff funds for construction of the project.

Following nonjury trial, the trial court made extensive findings of fact and entered judgment in favor of plaintiff and against Meco and Fidelity on the petition for $189,464.74. Meco was denied recovery on its counterclaim. Meco contends that the trial court erred in its findings of fact and determination of law in several respects, including that the award of damages "was against the weight of the substantial evidence".

## I. REVIEW STANDARDS

Review is under Rule 73.01(c). As that rule is interpreted, this court is to affirm the judgment unless there is no substantial evidence to support it, the judgment is against the weight of the evidence, errone-

ously declares the law, or erroneously applies the law. *Plunkett v. Parkin,* 788 S.W.2d 356, 357 (Mo.App.1990). A judgment is to be set aside because it is against the weight of the evidence only with caution and with a firm belief that the decree or judgment is wrong. *Id.*

"Weight of the evidence" means its weight in probative value, not its quantity. *Looney v. Estate of Eshleman,* 783 S.W.2d 164, 165 (Mo.App.1990). "The weight of evidence is not determined by mathematics, but on its effect in inducing belief." *Id.*

Due regard is given to the trial court's determination on the credibility of witnesses. Rule 73.01(c)(2); *Centennial Insurance Co. v. International Motor Car,* 581 S.W.2d 883, 885 (Mo.App.1979). The trial judge as the trier of fact can disbelieve testimony even where uncontradicted. *Robinson v. Estate of Robinson,* 768 S.W.2d 676, 677 (Mo.App.1989).

## II. DENIAL OF MECO'S COUNTERCLAIM

### A. Monetary Amount

■ Meco's first point states that the trial court erred in finding that the contract between it and plaintiff "was a guaranteed maximum cost contract" and in denying it recovery on its counterclaim because the $102,333.50 it sought was based upon pay applications approved for payment by plaintiff's president. Not all were paid because the construction loan at Great Southern Savings and Loan Association was exhausted by prior payments, including $1,317,405.76 to Meco. Some payments were made to Meco thereafter from sales of condominiums on the project. In the findings of fact, the trial court determined that Meco's claim was not "proved by substantial evidence introduced by Meco."

The parties agree that numerous changes were made in the plans and specifications which would entitle Meco to more than the contract initially provided. They disagree as to the extent of the modifications and whether Meco was entitled to anything more than it received.

Homer A. White III, was the president and "major stockholder" of plaintiff. As such, he executed the contract between plaintiff and Meco. White was on the premises during construction and was plaintiff's primary representative on the project. White testified that he signed, giving approval to, all the pay applications made by Meco and usually picked up the checks from Great Southern Savings and Loan Association and took them to Meco. The contract provided for a "maximum cost" of $1,247,667.00. White testified that through the 13th pay application of Meco the cost of the project reached $1,225,201.17 and he calculated that the additional cost to complete it would be $185,761.00. This would bring the cost to $1,410,962.17.

Plaintiff presented evidence through White's daughter, an employee of plaintiff, questioning certain items included in the pay applications, totaling $5,657.43. During trial, Meco reduced its claim on its counterclaim from $104,760.53 to $102,333.50, apparently conceding that there had been overbilling of $2,427.03.

The trial court found that Meco was overpaid $5,103.52, for items never delivered or overbilled. As the trial court included them in the damages awarded plaintiff, it necessarily found that the items were included in the applications of Meco which had been paid. In the judgment plaintiff was awarded slightly over 90% in amount of the items questioned.

By White approving the applications and questioning only a few of the items contained in them, Meco established with substantial evidence it was entitled to the amount finally sought. We have a firm belief that any contrary finding was against the weight of the evidence. Whether the contract was a "guaranteed maximum cost" contract or a "cost plus a fee" contract need not be decided as the parties agree that changes were made raising the contract limits. White approved the pay applications and, in effect, agreed that Meco was entitled to payment except for the items and amounts questioned.

This court is obligated to order the judgment that should have been entered effec-

tive on the date of the judgment in the trial court. *In re Marriage of Runez*, 666 S.W.2d 430, 433 (Mo.App.1983); Rule 84.14. Meco is entitled to recover $102,333.50 on its counterclaim, with interest from October 30, 1986, (thirty days after its last payment) as provided by § 408.020, RSMo 1986, effective as of the date of the judgment, January 9, 1990.

### B. Denial of Mechanic's Lien

■ Meco sought a mechanic's lien, but that was denied by the trial court because it was not entitled to recover any amount from plaintiff, and because it failed to give the notice required by § 429.012 RSMo 1986. That section is set forth marginally:[1]

Meco admits that it did not give the notice. Relying primarily upon *Overberg Decorating Center, Inc. v. Selbah Properties*, 741 S.W.2d 879 (Mo.App.1987), Meco contends that as White was a "knowledgeable developer" who understood the mechanic's lien law, the notice was not required. Although *Overberg* contains language supporting Meco's position, there, notice substantially equivalent to that required in the statute was given. 741 S.W.2d at 881.

As Meco suggests, the purpose of the statute "is to warn inexperienced property owners of the danger to them which lurks in the mechanics' lien statute." *BCI Corp. v. Charlebois Const. Co.*, 673 S.W.2d 774, 779 (Mo. banc 1984); *Overberg*, 741 S.W.2d at 881. However, the statute does not limit the necessity of this notice to those inexperienced with, or having lack of knowledge about, the mechanics' lien laws.

The statute has no exceptions. When a statute is without exceptions, courts should not create them. *Matter of A__ F__*, 760 S.W.2d 916, 918 (Mo.App.1988). Allowing a lien when there was not substantial compliance with this section would add another issue to each mechanic's lien case, the property owner's knowledge of the mechanic's lien law. It seems unlikely the legislature intended such a result, as there are no limitations or exceptions to the giving of the notice. Meco is not entitled to a mechanic's lien.

### III. AWARD OF DAMAGES TO PLAINTIFFS

Plaintiffs Meco and Fidelity, in their second point, contest, in several particulars, the propriety of the trial court's award of damages of $189,464.74 to plaintiff.

### A. Compliance with Rule 73.01(a)(2)

■ Rule 73.01(a)(2) provides in part "[i]f any party so requests before final submission of the case, the court shall dic-

---

1. Section 429.012, RSMo 1986 states:
   **Original contractor to have lien, when—notice required, form of—penalty for failure to notify—exception to requirement.—**
   1. Every original contractor, who shall do or perform any work or labor upon, or furnish any material, fixtures, engine, boiler or machinery for any building, erection or improvements upon land, or for repairing the same, under or by virtue of any contract, shall provide to the person with whom the contract is made prior to receiving payment in any form of any kind from such person, (a) either at the time of the execution of the contract, (b) when the materials are delivered, (c) when the work is commenced, or (d) delivered with first invoice, a written notice which shall include the following disclosure language in ten point bold type:
   NOTICE TO OWNER
   FAILURE OF THIS CONTRACTOR TO PAY THOSE PERSONS SUPPLYING MATERIAL OR SERVICES TO COMPLETE THIS CONTRACT CAN RESULT IN THE FILING OF A MECHANIC'S LIEN ON THE PROPERTY WHICH IS THE SUBJECT OF THIS CONTRACT PURSUANT TO CHAPTER 429, RSMo. TO AVOID THIS RESULT YOU MAY ASK THIS CONTRACTOR FOR "LIEN WAIVERS" FROM ALL PERSONS SUPPLYING MATERIAL OR SERVICES FOR THE WORK DESCRIBED IN THIS CONTRACT. FAILURE TO SECURE LIEN WAIVERS MAY RESULT IN YOUR PAYING FOR LABOR AND MATERIAL TWICE.
   2. Compliance with subsection 1 of this section shall be a condition precedent to the creation, existence or validity of any mechanic's lien in favor of such original contractor.
   3. Any original contractor who fails to provide the written notice set out in subsection 1 of this section, with intent to defraud, shall be guilty of a class B misdemeanor and any contractor who knowingly issues a fraudulent lien waiver shall be guilty of a class C felony.
   4. The provisions of this section shall not apply to new residences for which the buyer has been furnished mechanic's and supplier's lien protection through a title insurance company registered in the state of Missouri.

tate to the court reporter, or prepare and file, a brief opinion containing a statement of the grounds for its decision and the method of determining any damages awarded". Meco and Fidelity made such a request and contend that the trial court "failed to include in its judgment a statement of its method of determining damages". The parties cite no cases construing this provision of Rule 73.01 and we have found none. The complaint made is that the court did not include such a statement "in its judgment". We do not think the rule requires that the grounds be stated there, but it is sufficient if it is stated in its findings. Those findings include the detail set forth marginally.[2] After making the findings set forth below, the trial court again summarized the damages by finding that plaintiff was entitled to damages against Meco and Fidelity as follows:

**2.**

### DAMAGES PLAINTIFF IS ENTITLED TO, IF ANY, AND REASONS AND AMOUNTS THEREOF

1. The defendant has breached its contract to perform the project in a workmanlike manner.

2. Plaintiff is entitled to certain sums for items not received, for warranty and rework to repair and rework items completed, to complete the project and for overall depreciation of the project.

3. White River is entitled to the following sums billed for and not received or double billed:

| | | |
|---|---|---|
| Jolly Co. | $ 205.00 | (Used at Tapjac job, not White River) |
| Blackburn Brothers | $ 67.50  85.00 | (Porta Potty rental. There were never any Porta Pottys on site). |
| Bogle Glass | $2,245.16 | (One invoice of $824.64 was paid twice and $1,420.48 was charged for shower doors and installation when there are no shower doors on the premises). |
| Green Seed | $ 335.85 | (Grass seed and on the invoice it states it went to Walmart in Cassville, which was being built by Meco at the same time). |
| Knopke Brothers | $ 433.04 | (Tools and equipment purchased not on site). |
| Knopke Brothers | $1,551.97 | (Equipment leased by Meco for the job and later purchased by Meco using the lease payments of White River as credit against the purchase price). |
| Moore and Sons | $ 180.00 | (3 Gates were included in their bid that were never installed. Meco paid them for the job and White River never got the 3 gates). |

4. Plaintiff White River is entitled to recover for warranty work or rework by reason of the faulty work of Meco as follows:

| | | | |
|---|---|---|---|
| 7/18/86 | JM Specialty Sales Co. | $ 392.82 | (Sealer) |
| 8/14/86 | JM Specialty Sales Co. | $ 476.13 | (Sealer) |
| 7/28/86 | A & A Waterproofing | $ 177.12 | (Labor Foundation Coating) |
| 7/26/86 | Walmart | $ 40.05 | (Fans) |
| 7/31/86 | Austin Family Labor | $1,583.00 | (Labor) |
| 9/5/86 | Austin Family Labor | $ 371.00 | (End of job labor) |
| 8/86 | Austin Family Labor | $3,098.75 | (August Labor) |
| 8/27/86 | Lakeshore Construction | $ 210.00 | (part of 6/27 bill for checking water leaks) |
| 8/27/86 | Lakeshore Construction | $ 690.00 | (from 7/25/86 bill) |
| 8/27/86 | Lakeshore Construction | $4,479.54 | (digging out foundation and floors) |
| 7/31/86 | Jouneygan Construction | $ 299.86 | (Gravel) |
| 8/18/86 | Barclay's Rental | $ 265.83 | (Compactor Rental) |
| | Total | $12,261.22 | |

That said sums were required because of the water problems enumerated in the condominium units requiring that the foundations be dug out, tile reinstalled, the coating of walls with tar and felt and the backfilling of foundations.

5. That the plaintiff is entitled to judgment to complete the condominiums as follows:

| | |
|---|---|
| Plumbing | $13,620.00 |
| Electrical | 200.00 |
| Carpeting and Inlay | 17,040.00 |
| Contractor profit and overhead | 4,000.00 |
| | $34,860.00 |

| | |
|---|---|
| Payment for items never delivered or overbilled | $ 5,103.52; |
| Payment for warranty or rework which plaintiff had no obligation to pay to defendant | 12,261.22; |
| Damages for failure to complete the units | 34,860.00; |
| Damages for faulty or improper workmanship requiring repairs or reworking | 37,240.00; |
| Non-reparable damages to the entire project | $100,000.00; |

We regret setting forth such detail and repetition, but feel it is necessary to illustrate that the trial court attempted to comply with the request and we fail to see how much further detail could have been set forth. This, like other required findings of fact, see *State v. Richard*, 798 S.W.2d 468, 472 (Mo.App.1990), allows the parties to know the basis of the court's decision on damages and aids meaningful appellate review on those issues. It is difficult to see what more the trial court could have done. It sufficiently complied with Rule 73.-01(a)(2).

### B. Award of Non–Reparable Damages

Meco and Fidelity contend that the trial court erred in awarding plaintiff $100,000 for "damages for lack of workmanship which is non-reparable". They state that the trial court should not have awarded "both repair damages and nonreparable damages because the proper measure of damages is the lesser of diminution in value and cost of repair, and, the trial court erred ... in awarding plaintiff non-reparable damages because plaintiff failed to demonstrate by substantial evidence that unreasonable economic waste would occur in bringing the structure into conformity with the contract."

Lige Frost, a real estate appraiser, testified for plaintiff that if the units "had been completed and with good workmanship" they would have been worth $1,134,000 "in the early part of 1986". When asked for "a fair market value of these units assuming that they are completed and also assuming that all of the problems that you can see that can be fixed are fixed", he replied, "I gave it a 50 percent depreciation, even if they are completed, which would give a total of $567,000, rounded figure."

When questioned about the "depreciation" being "so large", Frost replied: "If and when this property is sold, it will have to have full disclosure by whoever sells it for it to an [sic] ethical sale. All of these problems that have been in the past, or that I saw, will have to be disclosed. And in disclosing it, it would affect the market considerably." The "problems" that he referred to included that concrete floors "were jackhammered out" and "the wrought iron would have to be completely worked over, all the carpeting would have to be redone", with the "biggest problem" being water drainage.

6. That the plaintiff is entitled to judgment for the following amounts for repairs and reworking of items:

| | |
|---|---|
| Sheetrock repair and painting | $ 4,900.00 |
| Replacement of concrete to resolve drainage and mildew problems | 25,780.00 |
| Inlay replacement | 1,760.00 |
| Ironwork rework | 4,800.00 |
| | $37,240.00 |

7. That the Court has specifically taken into consideration plaintiff's request for replacement of patio sliding doors and the facie boards but does not believe because of the passage of time regarding the doors and Mr. White's own insistence regarding the board that defendant should be responsible for same.

8. That plaintiff is entitled to damages for overall depreciation of the project. In assessing such damages this Court has considered the insistence of Mr. White not to have guttering or downspouts, his insistence that completion be done inexpensively and thus make use of inferior pine facie board, hollow-core doors, screen doors and windows, and one-coat splatter interior paint. The Court has further considered the instructions of Mr. White not to install floor coverings, carpeting, light fixtures and bathroom fixtures until the units sold, and the overall impact same would have on the marketability of the units. The Court has considered that amenities such as a golf course, restaurant, tennis courts, etc. are not available.

9. The Court finds that the Windor [sic] Bay Project located near the small community of Shell Knob and the difficulties encountered with such project will be a matter of common knowledge to many

There was evidence that because dirt beneath them was improperly compacted, the concrete floors had to be partially removed by jackhammers, as they settled and damaged water pipes. The architect who designed the project said patios and sidewalks were to slope away from the buildings. White testified that Meco constructed them sloping toward the buildings and this caused water problems. He said he complained to Meco about this but got no response.

White testified that "the poor workmanship of Meco" diminished the value of the units by $20,000.00 each as of the first week of September 1986. Plaintiff presented evidence of the cost of repairing work Meco did and of the cost of completing the project. The effect of repair or completion on White's opinion of the units' diminished value was not explored.

Where there is substantial but defective performance by a contractor, damages to an owner are determined by either or both of two different standards, depending upon the facts of the case. *Lawing v. Interstate Budget Motel, Inc.*, 655 S.W.2d 774, 778 (Mo.App.1983). Generally, the measure of damages is the cost of correcting the defects or supplying the omissions, known as the "cost rule". *Id.*

The other method is called the "diminished value rule". It is the difference between the value of the property with the defective work and what its value would have been if it had been constructed according to the terms of the contract. This rule is appropriate where the cost of reconstruction and completion in accordance with the contract would involve unreasonable economic waste. *Id.* at 779. Where there are a number of defects, the value rule may be applicable to some and the cost rule to others. *Id.* at 778 n. 1. Other cases discussing these rules are set forth marginally.[3]

An owner may not recover for the cost of reconstruction and completion in accordance with the contract if this would involve unreasonable economic waste, that is, destruction of usable property. *Forsythe v. Starnes*, 554 S.W.2d 100, 109 (Mo.App. 1977). If unreasonable economic waste would occur, the owner's damages should be calculated by the difference in value formula. *Id.*[4]

■ One of Meco's and Fidelity's arguments that the calculation of damages was improper is based on certain units having been sold. They contend the trial court may have included damages for repair and completion to those units. We see no error there. Meco agreed to construct those units and plaintiff would be entitled to damages for improper or defective workmanship even if it sold those units.

■ There are a number of claimed defects here, some which could be repaired or corrected, and others that the evidence indicated would be impractical to repair. As earlier noted, in such an instance, damages can include both those determined under the value rule and cost rule. This disposes

members of the community.

The Court finds that having considered the testimony as to damages of Mr. Frost of 50% depreciation, of Mr. White of $12,000.00 per unit, of Mr. Middleton, Ball, and Riebold of no damage and giving due consideration to all of such expert testimony and all other credible evidence, that plaintiff is entitled to damages for lack of workmanship which is nonreparable in the sum of $100,000.00.

3. *Hernandez v. Westoak Realty & Investment, Inc.*, 771 S.W.2d 876, 880 (Mo.App.1989); *Steffens v. Paramount Properties, Inc.*, 667 S.W.2d 725, 728 (Mo.App.1984).

4. There is authority in some jurisdictions that residential construction damages are the cost required to conform to the plans, since, unlike commercial building a dwelling has esthetic value and must be constructed as the owner wants it even though the finished dwelling is just as good. *Rust & Martin, Inc. v. Ashby*, 671 S.W.2d 4, 7 (Mo.App.1984). Whether that is applicable to Missouri was not decided in *Rust.* As neither party raises such a question, it is not necessary to decide if Missouri would treat residential construction damages differently or if such difference would apply to this project.

of Meco's and Fidelity's contention that the court should not have awarded both such damages.

The evidence indicated that some defects in construction, such as the jackhammering of the concrete floors, would always be apparent, unless the floors were completely replaced by removing the improvements and starting again. Frost gave his depreciation of the value based on the premises that the problems he saw that could be fixed would be. It was his opinion that certain defects could not be corrected. Obviously he meant it would be unreasonable to correct them as any building defect could be corrected, if perhaps only by complete demolishment and reconstruction. We conclude, giving deference to the trial court, that there was sufficient evidence for it to award the $100,000 for nonreparable damage.

### C. Repair Damages

Melvin Carman, an experienced contractor, testified to the costs necessary to make various corrections or repairs. Meco and Fidelity question his credibility, but we conclude that was for the trial court. His testimony was substantial evidence supporting the award for "repairs or reworking" due to "faulty or improper workmanship".

### D. Damages For Failing To Complete

The architect who designed the project issued a certificate of substantial completion dated March 6, 1986. Plaintiff presented evidence on the cost of completion and the trial court awarded plaintiffs $34,860 as "damages for failure to complete the units".

As earlier concluded, Meco was not paid amounts due it. Therefore, it was not obligated to continue working. When a progress payment due is not made, a builder is entitled to suspend performance and await either other assurances satisfactory to it or actual payment. *Hart and Son Hauling, Inc. v. MacHaffie,* 706 S.W.2d 586, 588 (Mo.App.1986). See also *Stewart v. C & C Excavating & Construction Co.,* 877 F.2d 711, 714 (8th Cir.1989) (failure to make progress payment may justify a subcontractor in suspending performance).

If Meco did not complete the project, it was within its right in not doing so. Damages against it for not completing the project were improperly awarded.

### IV. CONCLUSION

The portion of the judgment denying Meco monetary recovery on its counterclaim is reversed, as well as the portion of the judgment awarding plaintiff completion damages of $34,860. The remainder of the judgment is affirmed. The cause is remanded to the trial court with directions to amend the judgment to award Meco $102,333.50 on its counterclaim, with interest from October 30, 1986, at 9% per annum and to award plaintiff $154,604.74 against Meco and Fidelity, with interest from the date of the initial judgment at 9% per annum. Costs of the appeal to be divided equally among the parties.

CROW and HOGAN, JJ., concur.

MAUS, P.J., recused.